**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,
ex rel., CARISSA STONE M.D.,

      Plaintiff-Relator,

vs.

                      Civil Action No: _____

                      FILED UNDER SEAL
                      JURY TRIAL DEMANDED

                      DO NOT PLACE IN RUN BOX

RIVERSIDE SPINE & PAIN PHYSICIANS,       DO NOT PLACE ON PACER
L.L.C., d/b/a RIVERSIDE SPINE & PAIN
PHYSICIANS, P.L.

      Defendant.

_____

**PLAINTIFF-RELATOR CARISSA STONE, M.D.'S QUI TAM COMPLAINT**

      Through her undersigned attorneys, Plaintiff Carissa Stone, M.D. ("Plaintiff-Relator"), on

behalf The United States of America, the State of Florida, files this Complaint against Riverside

Spine & Pain Physicians, L.L.C., d/b/a Riverside Spine & Pain Physicians, P.L. ("Defendant")

and alleges as follows:

**I.**       **INTRODUCTION**

      1.     This is an action to recover damages and civil penalties, on behalf of the United

States Government (the "United States" or the "Government") and the State of Florida, arising

from false and/or fraudulent statements, records and claims made and caused to be made by the

Defendant and/or their agents and employees in violation of the federal False Claims Act 31

United States Code Section 3729, *et. seq.*, as amended (the "FCA" or the "Act"), the Florida

False Claims Act, Florida Statute Section 68.081, *et. seq* ("State Act"). This *qui tam* action is brought against Defendant for knowingly defrauding the Federal and State Governments.

2.    This *qui tam* action is brought against Defendant for knowingly defrauding the Federal and State Governments in connection with the Medicare and Medicaid programs. As alleged below, for at least the past two years, Defendant has engaged in a scheme to falsely bill the federal and Florida government for services rendered by physicians employed by Defendant or whom are part owner of Defendant.

3.    The submission of the false claims involved improper billing for full/complete vials of contrast solution and medications, when only for a portion of the vials were utilized. The billing involved submissions for reimbursement for complete vials, when on multiple occasions, Defendant would use only a portion of one vial, but billed for a complete vial each time. These false submissions resulted in dramatic increases in income for the Defendant and their physician owners. Defendant's encouragement, toleration of, billing Government payors for and sharing excess income resulting from the false claims by Defendant and physician owners is in complete violation of the Act and State Act.

4.    Defendant has continued to submit false bills for the contrast solution and medications involving Medicare and Medicaid patients in violation of federal and state law. Defendant continues to submit claims and to receive thousands of dollars in Medicare and Medicaid reimbursement that Defendant is not legally entitled to receive. Under the False Claims Act, 31 United States Code Section 3729 (a)(1) (A) (2016) and Florida False Claims Act, Florida Statute Section 68.082, such claims are false and fraudulent because Defendant has no entitlement to payment for such unlawful billings.

5.      Defendant continued its actions, despite knowing that thousands and possibly millions of dollars in payments from the Federal and State Governments have been received in violation of the Act's and State Act's prohibition on receipt of payment for services rendered and billed improperly. Such acts are prohibited under the False Claims Act, Section 3729(a)(1)(A) and Florida False Claims Act, Florida Statute Section 68.082.

6.      The submission of false claims also involved the billing for services not performed by physician owners or employees of the practice. Defendant made alterations to its electronic medical records ("EMR") system that resulted in upcoding of some procedures or billing for procedures that were in fact not performed. The billing for these upcodes and/or services resulted in dramatic increases in income for the Defendant. Defendant's encouragement, toleration of billing Government Payors and sharing excess income resulting from the false claims by Defendant and is in violation of the Act and State Act.

7.      Defendant has continued to submit false bills for the upcoded services or for services not performed involving Medicare and Medicaid patients in violation of federal and state law. Defendant continues to submit false claims and to obtain thousands and possibly millions of dollars in Medicare and Medicaid reimbursements that Defendant is not legally entitled to receive. Under the False Claims Act, Section 3729(a)(1)(A), such claims are false and fraudulent because the defendant has no entitlement to payment for such unlawful billings.

8.      Defendant continued its actions despite knowing that thousands and potentially millions of dollars in payments from the Federal and State Governments has been received in violation of the FCA's prohibition on receipt of payment for services rendered and billed improperly under the FCA, Section 3729(a)(1)(A).

9.     The Federal Treasury has been damaged in a substantial amount as a direct result of Defendant's improper practices.

## II.     PARTIES

10.     Plaintiff-Relator Carissa Stone, M.D., is a resident of Tampa, Florida. She was employed as a physician by Defendant, Riverside Spine & Pain Physicians, L.L.C. d/b/a Riverside Spine and Pain Physicians, P.L for approximately two years. Her responsibilities include providing physician services in the Tampa office of Defendant. Dr. Stone has been employed by Defendant for over two years.

11.     Defendant is a Florida Limited Liability Company with its principal place of business at 7207 Golden Wings Road, Suite 100 Jacksonville, Florida 32244. Defendant employed Plaintiff-Relator Carissa Stone, M.D. in Defendant's Tampa office.

12.     Defendant employs over ten physicians in offices in the Jacksonville area, Tampa, and Savannah, Georgia.

13.     As relevant to this Complaint, Defendant Riverside owns and/or operates, directly or indirectly, and/or does business at the following locations: Orange Park (7202 Golden Wings Road, Jacksonville, Florida 32244), Intracoastal (13133 Professional Drive, Jacksonville, Florida 32225), Southside (7740 Point Meadows Drive, Jacksonville, Florida 32256), Northside (2386 Dunn Avenue, Jacksonville, Florida 32218), Jacksonville Beach (1375 Roberts Avenue, Jacksonville Beach, Florida 32250), Fleming Island (2349 Village Square Parkway, Fleming Island, Florida 32003), Mandarin (12078 San Jose Boulevard, Jacksonville, Florida 32223), St. Augustine (105 Mariner Way, St. Augustine, Florida 32086), Tampa (3622 Madaca Lane, Tampa, Florida 33618) and Savannah (2453 Highway 17, Richmond Hill, Georgia 31324).

14.     The Defendant bills and collects out of the home office at 7207 Golden Wings Road, Suite 100 in Jacksonville for all services provided to Medicare and Medicaid patients throughout its various locations. Defendant is responsible for verifying the services performed and ensuring and submitting accurate information to the government payors for reimbursement.

### III.     JURISDICTION AND VENUE

15.     This court has jurisdiction over the subject matter of this action pursuant to 28 United States Code Sections 1331 (federal question jurisdiction) and 1332, the latter specifically confers jurisdiction upon this court for matters brought pursuant to 31 United States Code Sections 3729 and 3730, as well as 28 United States Code Section 1345 (as the United States is a Plaintiff) and 31 United States Code Section 3732.

16.     Additionally, the Court may exercise supplemental jurisdiction over the state law claims pleaded herein pursuant to 28 United States Code Sections 3732(b) and 1367(a), as these claims arose out of the same transactions, occurrences, circumstances and facts as the federal law claims also pleaded herein. Judicial economy would be served.

17.     To Relator's knowledge, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 United States Code Section 3730(e). Moreover, whether or not such a disclosure has occurred, Relator would qualify under that section of the Act as an "original source" of the allegations in this Complaint. Before filing this action, Relator voluntarily disclosed and provided to the Government the information on which the allegations or transactions in this action are based. Additionally, Relator has knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred without their knowledge.

18.     Venue and jurisdiction is proper in the Middle District of Florida pursuant to 28 United States Code Sections 1391(b) and 1395(a), as well as 31 United States Code Section 3732(a), because Defendant is a corporate entity that has engaged in concerted misconduct as alleged herein and transacts business in this District, including business related to Defendant's misconduct.

## IV.     APPLICABLE FEDERAL HEALTHCARE PROGRAMS AND LAWS

### A.     The Medicare Program

19.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program. Medicare is a federally-funded health insurance program primarily benefiting the elderly. Entitlement to Medicare is based on age, disability, or affliction with end- stage renal disease. *See* 42 U.S.C. § 426, *et seq.* The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

20.     Part B of the Medicare Program, the Voluntary Supplemental Insurance Plan, covers outpatient and ambulatory services as well as services performed by physicians and certain other health care providers, whether inpatient or outpatient. 42 C.F.R. § 410.3.

21.     To assist in the administration of Medicare Part B, CMS contracted with "carriers." Carriers, typically insurance companies, have been responsible for processing and paying Part B claims. Beginning in November 2006, Medicare Administrative Contractors ("MACs") began replacing both the carriers and fiscal intermediaries. *See* Fed. Reg. 67960, 68181 (Nov. 2006). The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. *See* 42 § C.F.R.

6

421.404(b).

22.     Physicians receive payment for their professional services performed in their offices. When services are rendered in an independent physician's office, Medicare reimburses the billing entity through a single payment based on the physician fee schedule.

23.     Medicare enters into provider agreements with physician groups to establish the group's eligibility to participate in the Medicare program.

24.     As detailed below, Defendant submitted claims for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare and Medicaid beneficiaries.

25.     Defendant also submitted claims for medications or solutions administered directly to a patient "incident to" a physician service, under Part B of the Medicare Program.

26.     Defendant utilized a claim form, called a CMS 1500 (formerly known as a HCFA 1500), that serves as a "Request for Medicare Payment" which includes the services provided to the patient, the condition of the patient, and the physician providing services. Defendant expressly and impliedly certified that the information on the CMS 1500 submission was truthful. The carriers or MAC's hired by CMS to administer Defendant's claims reviewed and relied on the veracity of the information submitted in determining whether to pay for the services.

**B.     General Rules for Billing Physician Services**

27.     Under Medicare rules, physician services are reimbursed through a payment system called the Resource Based Relative Value Scale ("RBRVS"). In the RBRVS system, payments for medical services and procedures are determined by the resource costs needed to provide them. Payments are calculated by multiplying a standardized measure of the amount of resources the service or procedure is expected to require by a region-specific payment rate

(conversion factor).

28.     RBRVS payments are based on the Healthcare Common Procedure Coding System ("HCPCS"). HCPCS is a standardized coding system designed to ensure that Medicare, Medicaid, and other federal- and state-funded health care programs pay for services rendered to patients by physicians and other healthcare professionals in accordance with payment schedules tied to the level of professional effort required to render classes or types of medical care. To ensure uniform descriptions of medical care rendered and consistent compensation for similar work, Government-funded healthcare programs tie levels of reimbursement to these standardized codes.

29.     The Current Procedural Terminology ("CPT") codes are a subset of the HCPCS codes and are published and updated annually by the American Medical Association. Base CPT codes are five-digit numbers organized in numeric sequences that identify both the general area of medicine to which a procedure relates (such as "Evaluation and Management," "Anesthesiology," "Surgery," "Radiology," or general "Medicine") and the medical services and procedures commonly performed by physicians working in that field.

30.     Physicians typically submit claims to Medicare and Medicaid for professional services on CMS 1500 forms. Many physicians employed by a group may assign their right to bill for their services to the group in return for a compensation package. Relator assigned her right to bill for services to Defendant.  In such a case, the group will bill for the physician's services. Either way, the claim form sets forth the diagnostic code describing the patient's presenting condition and the procedural codes. On the claim form, the physician certifies that the services were "medically indicated and necessary to the health of the

patient."

31.     Medicare will only pay for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395(a)(l)(A).

32.     The medical necessity requirement applies not only to the fact of treatment, but also to the level of treatment provided to the patient. Medicare will not pay for more expensive services if only less expensive services were medically necessary. For physician services, "medical necessity of a service is the overarching criterion" for determining which CPT code is appropriate. *See* Medicare Claims Processing Manual, Chapter 12 § 30.6.1(A).

33.     Although CPT codes are used by Medicare to determine the appropriate levels of reimbursement for specific medical procedures and services, those codes are not intended to substitute for adequate documentation in a patient's medical record of all medical services rendered. In part to establish that care was appropriately rendered and medically necessary, patient medical records must also document the reason for the patient encounter and relevant history, physician examination findings, and prior diagnostic test results; assessment, clinical impression or diagnosis; plan for care; time and date; and legible identity of the provider. The patient's progress, response to and changes in treatment, and revision of diagnosis should also be documented. If not documented, the rationale for ordering diagnostic and other ancillary services should be easily inferred, and past and present diagnoses should be accessible. The documentation must support the CPT codes reported on the health insurance forms. See CMS's 2010 Evaluation and Management Services Guide, at 4.

34.     Although documentation is important, the "volume of documentation should not be the primary influence upon which a specific level of service is billed."

Medicare Claims Processing Manual, Chapter 12 § 30.6.1(A). Instead, the level of service should be determined based on the nature and severity of the patient's problem(s) and the required course of treatment, as determined through exercise of the physician's honest medical judgment, unclouded by personal financial interest.

**C.    Specific Billing Rules**

**i.    Billing for Evaluation and Management Services**

35.    Under the CPT coding system, standard office visits, whether conducted in a physician's office, in a hospital, or in another setting are classified as Evaluation and Management ("E&M") services. Each category of E&M has a range of codes, (i.e., 99201 to 99205, and 99211 to 99215) reflecting a range of intensity of services provided. Higher level codes indicate a more intensive service. Providers receive higher reimbursement for a higher level code (e.g., 99205) than a lower code (e.g., 99201).

36.    In 1995, 1997, and 2008, CMS issued Documentation Guidelines for E&M Services. To determine the appropriate level of E&M services to be coded, seven components must be assessed. The components are: (1) patient history; (2) physical examination; (3) medical decision making; (4) counseling; (5) coordination of care; (6) the nature of the presenting problem; and (7) the time involved in meeting with the patient.

37.    The first three components of the assessment (patient history, physical examination, and medical decision making) are the most important elements for coding purposes. The greater the intensity of the history, examination, and medical decision making components, the higher the level of CPT E&M code that may be assigned.

38.    The "patient history" component of the E&M visit includes documentation

of some or all of the following elements: (a) the patient's chief complaint ("CC"); (b) history of the patient's present illness ("HPI"); (c) review of the patient's systems ("ROS"); and (d) the patient's past, family, and/or social history ("PSFH"). The more extensive the patient history that must be explored and considered in order to render care, the better the justification for increasing the coding level of the E&M visit.

39.      There are two types of examinations that can be performed during an E&M visit: (a) a general multi-system examination; or (b) a single organ system examination. A general multi-system examination involves the examination of one or more of the following areas: (a) Constitutional Symptoms, fever, or weight loss; (b) Eyes; (c) Ears, Nose, Mouth, or Throat; (d) Neck; (e) Respiratory; (f) Cardiovascular; (g) Chest (breasts); (h) Gastrointestinal; (i) Genitourinary; (j) Lymphatic; (k) Musculoskeletal; (l) Integumentary; (m) Neurological; and (n) Psychiatric. A single organ system examination, on the other hand, involves a more extensive examination of a specific organ system. Although a single organ system examination includes examination of a range of systems, the elements of the examination are more closely tailored to address problems related to a dysfunction of the primary system.

40.      Typically, E&M visits that occur under circumstances that warrant a multi-system examination are properly billed at a higher level than those that warrant only a single organ system examination, unless that one system review requires an unusually extensive and in-depth review of that single organ system. Documentation of the visit must, however, provide information sufficient to indicate the medical necessity of high level examination efforts.

41.      The last of the three primary elements that determine the CPT level of an E&M service is the complexity of the medical decision making required. This element

measures the complexity of establishing a diagnosis or selecting a management option, and is based on the following three factors: (a) the number of possible diagnoses and/or the number of management options that must be considered; (b) the amount or complexity of medical records, diagnostic tests, and other material reviewed and/or other information that must be obtained, reviewed, and analyzed; and (c) the risk of significant complications, morbidity, or mortality, as well as comorbidities associated with the patient's presenting problem(s), the diagnostic procedure(s), and the possible management options. As with the history and examination, the physician may not exaggerate the complexity of decision making simply to raise the level of the CPT code and increase compensation.

### ii.  Billing of Modifier 25

42.     Generally, when a physician performs a procedure, all usual preoperative and postoperative care associated with the procedure is reimbursed through a single global payment. CMS Pub. 100-04, Chapter 12, § 40.2. All services integral to accomplishing the procedure are considered bundled into that procedure. Therefore, reimbursement for all such services is included in the reimbursement rate that has been established for the comprehensive procedure code. This includes the usual pre- and post-operative care generally associated with any procedure.

43.     In some cases, separate payment may be made for separately identifiable evaluation and management services provided on the same day of a procedure by the same physician who performed the procedure. Billing separately for E&M services during a single patient visit is permitted only when the patient's condition requires a significant, separately identifiable evaluation and management service above and beyond

12

the usual pre-operative and post-operative care associated with the procedure or service performed. In these circumstances, modifier "25" should be added to the appropriate level of evaluation and management service provided. CMS Pub. 100-04, Chapter 12, § 40.2.

44.    When modifier "25" is used to seek reimbursement for a separate E&M service, both the medically necessary E&M service and the procedure must be appropriately and sufficiently documented by the physician or qualified non-physician practitioner in the patient's medical record to support the claim for the services. CMS Pub. 100-04, Chapter 12, § 30.6.6.

   iii.    Billing for "Incident to" Services

45.    Medicare sometimes permits physician offices to bill for services provided by a non-physician practitioner such as a physician assistant (PA) or a nurse practitioner (NP) under the physician's provider number rather than the non-physician practitioner's provider number. CMS 100-02, Chapter 15, § 60. This allows the physician's office to receive reimbursement in the amount of 100% of the physician fee schedule allowable amount, whereas non-physician practitioners are and generally reimbursed at 85% of the physician fee schedule. CMS 100-04, Chapter 12, § 120. This use of a physician's provider number to bill for non-physician services is referred to as "incident to" billing because the non-physician practitioner's services are rendered "incident to" the physician's services.

46.    "Incident to" billing is permitted only under certain circumstances. When these circumstances are not met, a non-physician practitioner may still bill for services provided within his/her scope of practice but must do so under his/her own provider number. CMS 100-02, Chapter 15, § 60.2. This means that reimbursement by Medicare

will be at 85% of the physician fee schedule.

47.     In order for a practice to be reimbursed for supplies, including drugs and biologicals, they must represent an expense to the practice for the services or supplies. Coverage is provided if the cost of the drug represents a direct cost to the practice. Under these circumstances the appropriate J code must be utilized, and the dosage of the drug must be recorded and adequately reflect the total number of units. The practice should also record the amount of waste, if any.

48.     Another issue of concern for Defendant was the billing of advanced levels of urine testing. Defendant's practice requires the implementation of urine testing to decrease prescription drug abuse or illicit drug use by their pain management patients. The physicians monitor the patients based on a risk stratification ranging from low to high risk.

49.     CMS provides billing guidelines and recommendations for urine testing. Defendant conducts the initial test in their office, but sends the samples out for confirmation testing. Testing as well as reimbursement is based on the stratification for level of risk. A higher level test is ordered if there is an increased chance of dependency or drug usage. However, lower testing is appropriate when there are little-to-no indicators of dependency or abuse. Defendant consistently submits for high level conformation testing despite any indicators for the same in the medical records. These submissions result in unjustified higher reimbursements for Defendant.

### V.  Allegations and Summary Regarding of Defendant's Unlawful Conduct

50.     Plaintiff, Relator, initially became employed with Defendant in January of 2014. The majority of the medical services provided by Defendant relate to pain management and involve invasive procedures.

51.     Defendant has coding and documentation protocols for all procedures performed in its various offices. Defendant utilizes its EMR to create templates for certain procedures and CPT code levels.

52.     The implementation of the protocols and EMR templates allows Defendant to have an automatic upcode in their EMR system. Despite the medical record supporting a lower level procedure the EMR records and creates a bill for a higher code level, resulting in more income for Defendant.

53.     Defendant's attempt to increase income through their coding protocols and EMR template is evidenced by the number of Level 4 procedures that should have been billed at Level 3 or lower.

54.     The coding protocols and EMR template enable Defendant to capture a large amount of unjustified payments from Medicare and Medicaid.

55.     Defendant's protocol and EMR template extends to medicine and contrast solutions utilized by Defendant and billed "incident to" physician services. The primary example is the use of 5ml of contrast solution for a single procedure while billing for a 30ml vial. Under the billing requirements, although Defendant ordered a 30ml vial of contrast for a procedure, Defendant was required to bill only for the amount used, and report the amount discarded; however, despite only using 3 or 5ml per procedure, Defendant would exaggerate the amount used to the full and complete 30ml amount, resulting in an ill-gotten profit. Given

the number of procedures performed by Defendant, and the fact that contrast is used for the majority, results in a large profit center for the Defendant at the Federal and State Governments' expense.

56.     Defendant regularly orders urine confirmation tests that exceed the recommended risk level given the patients presentation and medical history.

57.     Defendant's ordering of urine tests at risk levels that are not supported by the medical record further demonstrates false billing. The urine testing ordered by Defendant results in a large amount of unjustified payments from Medicare and Medicaid.

58.     Plaintiff-Relator brought the improper coding, protocol, and template issues to Defendant's attention in the summer of 2015, but Defendant continued to use the same protocol and EMR templates.

59.     Relator has been practicing medicine for over 25 years, is well aware of the proper coding necessary for reimbursement, and the controls necessary to prevent any false billings.

60.     Relator brought her concerns to Defendant, Defendant chose to ignore those concerns, and instead took steps to end Relator's employment with Defendant.

61.     Defendant has never voluntarily repaid any reimbursement received from a federal or state payor based on physician overbilling, even when its own auditors have determined that overcharges have occurred.

62.     Defendant's physicians consistently and continually upcode services and procedures to obtain higher reimbursement. For many of the physicians, this works to their financial advantage because they receive bonuses based on the revenue attributable to their specific office locations. Therefore, the more revenue they can bring in, the higher their

bonuses may be.

63.     The consistent upcoding issues have resulted in overcompensation from Medicare and Medicaid. Defendant has refused to make the necessary corrections to the billing protocols and EMR templates.

64.     The overbilling includes systematic upcoding of E&M codes, ordering higher level urine tests, and improper use of modifiers to obtain reimbursement when it was not properly due.

65.     Had CMS known the true nature of the claims, they would not have reimbursed Defendant.

**Count I**
**False Claims Act**
**31 U.S.C. § 3729(a)(1) & (3) (1986)**
**31 U.S.C.§ 3729(a)(l)(A) & (C) (2009)**

66.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1–65 above as though fully set forth herein.

67.     This is a claim for treble damages and penalties under the False Claims Act, 31 United States Code Section 3729, *et·seq.*, as amended.

68.     With respect to acts occurring prior to the effective date of the 2009 False Claims Act amendments, by and through the acts described above, Defendant has knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

69.     The Government, unaware of the falsity of all such claims made or caused to be made by Defendant, has paid and continues to pay such false or fraudulent claims that would not be paid but for Defendant's illegal conduct.

70.     By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

71.     Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

**Count II**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(G) (2009)**

72.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1–65 above as though fully set forth herein.

73.     This is a claim for treble damages and penalties under the False Claims Act, 31 United States Codes Section 3729, *et seq.*, as amended.

74.     By and through the acts described above, Defendant has knowingly concealed and improperly avoided an obligation to pay money to the Government, including specifically Defendant's obligation to report and repay past overpayments of Medicare and Medicaid claims for which Defendant knew refunds were properly due and owing to the United States Government.

75.     The Government, unaware of the concealment by the Defendant, has not made demand for or collected the years of overpayments due from the Defendant.

76.     By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

77.     Additionally, the United States is entitled to the maximum penalty of up to

78.     $11,000 for each and every violation alleged herein.

## Count III
### Florida False Claims Act, Florida Statute Seciton 68.082(2)(a)–(b)

79.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1–65 above as though fully set forth herein.

80.     This is a claim for treble damages and penalties under the Florida False Claims Act, Florida Statute Section 68.082(2)(a)–(b).

81.     By and through the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the State of Florida in order to obtain Government reimbursement to which Defendant was not entitled for health care services provided under Medicaid and other state-funded health care programs.

82.     In addition, by and through the acts described above, Defendant knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

83.     The State of Florida was unaware of the falsity of all such claims made or caused to be made by Defendant.

84.     By reason of Defendant's acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

85.     Additionally, the State of Florida is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

### PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1.     that Defendant cease and desist from violating 31 United States Code Section 3729 *et seq.*

2.     that this Court enter judgment against Defendant in an amount equal to

19

three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 United States Code Section 3729; and

     3.    that this court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendant's actions, plus a civil penalty of $11,000 for each violation of the Florida False Claims Act, Florida Section 68.02.

> Respectfully submitted
> SHANKMAN LEONE, P.A.
>
> /s/ Ryan J. McGee
> Ryan J. McGee, Esq.
> Florida Bar No. 064957
> rmcgee@shankmanleone.com
> 707 N. Franklin Street, 5th Floor
> Tampa, Florida 33602
> Phone: (813) 223-1099
> Fax: (813) 223-1055
> *Attorneys for Plaintiff-Relator*